UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SETONDJI VIRGILE NAHUM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:20 CV 1524 RWS |
| | ) | |
| LMI AEROSPACE, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM AND ORDER**

Plaintiff Setondji Virgile Nahum ("Nahum") filed this employment discrimination suit against his former employer, LMI Aerospace, Inc. ("LMI").[1] LMI terminated Nahum's employment in May 2020.  In his Amended Complaint Nahum alleges that LMI discriminated against him because of his race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Civil Rights Act of 1866, 42 U.S.C. § 1981.  LMI has filed a motion for summary judgment.  Because Nahum has failed to establish his claims of employment discrimination I will grant LMI summary judgment.

---

[1] In his Amended Complaint Nahum asserted claims under Title VII and § 1981 against three managers at LMI, Tad DeWalt, Beverly Green, and Brandy Hagedorn.  On February 11, 2021, I dismissed the Title VII claims brought against the individual managers.  On June 28, 2021, I dismissed the § 1981 claims against the individual managers.

*Legal Standard*

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Lynn v. Deaconess Medical Center, 160 F.3d 484, 486 (8th Cir. 1998)(citing Fed. R. Civ. P. 56(c)).  The party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of the affidavits, pleadings, depositions, answers to interrogatories, and admissions on file which it believes demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When such a motion is made and supported by the movant, the nonmoving party may not rest on his pleadings but must produce sufficient evidence to support the existence of the essential elements of his case on which he bears the burden of proof.  Id. at 324.  In resisting a properly supported motion for summary judgment, the plaintiff has an affirmative burden to designate specific facts creating a triable controversy. Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1113 (8th Cir. 2004).

Direct evidence of employment discrimination is rare, therefore, most cases rely on circumstantial evidence.  In the absence of direct evidence of

discrimination, courts employ the burden shifting analysis of <u>McDonnell Douglas</u>

<u>Corp. v. Green</u>, 411 U.S. 792 (1973)(Title VII case).[2]

Under the burden-shifting analysis, the plaintiff must first establish a prima

facie case of intentional discrimination.  <u>McDonnell Douglas</u>, 411 U.S. at 802;

<u>Bashara v. Black Hills Corp.</u>, 26 F.3d 820, 823 (8th Cir. 1994).  If the plaintiff

establishes a prima facie case, a presumption of discrimination is established and

the burden of production shifts to the defendant to articulate a legitimate, non-

discriminatory reason for the adverse employment action.  411 U.S. at 802.  The

defendant need not persuade the court that the articulated reason was the basis of

the employer's action; rather, it must simply provide some evidence of a non-

discriminatory reason or reasons for its action.   <u>St. Mary's Honor Center v. Hicks</u>,

509 U.S. 502, 509 (1993).

Upon the proffer of such evidence, the presumption of discrimination

established by the prima facie case "simply drops out of the picture."  <u>Id.</u> at 510-

11.  The burden then shifts back to the plaintiff to prove that the reason articulated

by the employer was really a pretext for discrimination.  <u>Aucutt v. Six Flags Over</u>

<u>Mid-America, Inc.</u>, 85 F.3d 1311, 1316 (8th Cir. 1995).  A rejection of the

employer's proffered non-discriminatory reason by itself or combined with

---

[2] The <u>McDonnell Douglas</u> burden-shifting framework is also used in analyzing race discrimination claims pursuant to 42 U.S.C. § 1981.   <u>Ellis v. Houston</u>, 742 F.3d 307, 320 (8th Cir. 2014).

elements of the prima facie case may be enough to establish, but does not compel, an inference of intentional discrimination.  St. Mary's Honor Center, 509 U.S. at 511.

The burden of proving discrimination remains on the plaintiff at all times. Id. at 515-16.  It is not enough to merely discredit defendant's articulated reason for the adverse employment action.  A plaintiff must always establish that the real reason for defendant's action was impermissible discrimination.  Id.;  see also Huston v. McDonnell Douglas Corp., 63 F.3d 771, 777 (8th Cir. 1995).  To avoid summary judgment, a plaintiff must present evidence that, when viewed in its entirety: (1) creates a fact issue as to whether the employer's proffered reason is pretextual, and (2) creates a reasonable inference that a discriminatory animus was a motivating factor in the adverse employment decision (Title VII claims) or the but-for factor in the adverse employment decision (ADEA, Section 1981, and retaliation claims).

### *Background*

The following background information is taken from the parties' statements of uncontroverted facts,[3] their responses thereto, and from the exhibits filed by the parties.

---

[3] A close reading of LMI's Statement of Undisputed Material Facts and Nahum's responses thereto shows that the vast majority of LMI's statements are all admitted by Nahum.  LMI submitted 128 undisputed facts.  Nahum did not respond to eight of them, admitted 12 of them, and disputed 89 of them but Nahum's disputes are unsupported by

LMI is a supplier of structural assemblies and components and a provider of engineering services to commercial and military aerospace markets.  Nahum, who describes himself as "African/Black," received an offer of employment at LMI's facility in Washington, Missouri on December 31, 2019.  He was hired as a Manufacturing Engineer and began work on March 2, 2020.  Nahum's employment was terminated twelve weeks later, on May 22, 2020.  During this period, Nahum and 100 other LMI employees were furloughed for three weeks due to the Covid-19 pandemic.  As a result, Nahum only worked at the LMI facility for nine weeks before his employment was terminated.

Prior to Nahum's start date, LMI had several personnel changes that resulted in an immediate need for an engineer in the Quality Department ("Quality").  Chris Lager, the Operations Manager at the facility, recommended to Tad DeWalt, the General Manager, that Nahum be placed in Quality when he started.  This was going to be on an interim basis to fill the immediate need in that department and to allow Nahum to learn LMI's processes and systems before starting in a manufacturing role.  When Lager made that suggestion, neither he nor DeWalt was aware of Nahum's race.

---

citations to the record in violation of Local Rule 7-4.01(E).  Although Nahum did reference exhibits to the remining 19 facts his proffered evidence did not create a genuine issue of material fact as to those statements.

It is common for employees to fill interim roles at LMI.  During the
timeframe Nahum was employed, 22 employees at the facility were in interim
positions, 21 of them were Caucasian.  On Nahum's first day of work, DeWalt
asserted that he discussed with Nahum the plan to assign him to Quality for an
interim period and that Nahum agreed to take the position.  In his response to
LMI's statement of undisputed facts Nahum asserted that he did not meet with
DeWalt until 3 or 4 days after he started work.  He also stated that he did not agree
to take the interim position and that he informed DeWalt, Lager, and Brandy
Hagedorn, the Manager of Human Resources, on multiple occasions of the
inadequacy and his lack of interest the Quality position.  Despite this assertion,
Nahum was assigned to and worked in Quality.

Nahum's temporary assignment to Quality was not a demotion or a lesser
role.  Nahum's pay, benefits, and hours of work remained the same.  The skills
needed to be successful in the Quality Engineer position did not substantially differ
from the skills needed to be successful in the Manufacturing Engineering position.
The job descriptions for both roles called for Nahum to assist with the resolution of
customer, technical, and quality issues.  DeWalt testified at his deposition that the
interim Quality position required many of the same tasks and skills needed for the
manufacturing role including: understanding dimensional problems on parts,

checking that against blueprint and specification requirements, and understanding what caused a problem in order to help correct the problem.

Nahum's assignment to Quality did not go well. DeWalt testified that Nahum lacked the skills needed to perform his job, including the ability to read blueprints, interpret specifications, and analyze manufacturing problems. LMI's Contracts Coordinator, Sherie Lynch; Engineering Manager, Kaylie VanLeer; and interim Quality Manager, Beverly Green all testified or attested that Nahum was provided with documents, including step-by-step instructions, and on-the-job training to assist him in completing his work. DeWalt testified that Nahum failed to meet performance expectations despite being routinely provided with on-the-job instruction regarding his job responsibilities and how to perform his work assignments. DeWalt and Green testified that Nahum failed to follow work instructions or to adjust his performance in response to feedback. Nahum disagrees with these statements.

As examples of Nahum's deficient performance LMI cites an attempt by Nahum on April 22, 2020, to change the traceability process called red penning, without consulting his manager or anyone else as to whether the change was advisable. On April 29, 2020, VanLeer and a co-worker located a part in Nahum's office without a job packet (job packets must accompany parts). They sent Nahum an email about the part but he never responded. Because the part was urgently

needed for a project, VanLeer retrieved the part from Nahum's office and had it sent out for rework.  Co-workers had to find parts in Nahum's office that Nahum had without their required job packets.  On at least five other occasions VanLeer had to find parts in Nahum's office that had been misplaced.

On May 4, 2020, DeWalt emailed two employees in Quality regarding a QC priority list.  He stated that they needed 75 jobs a day out of QC and that he was afraid that Nahum's lack of production was making things worse in that department.

On May 5, 2020, VanLeer emailed Nahum reminding him to make sure to follow the pertinent guide step-by-step.  She noted that Nahum was missing some of the steps or was not following them correctly causing huge issues for contracts, finance, and shipping/receiving.  VanLeer had previously provided these instructions to Nahum and attempted to talk through issues she had with his performance to no avail.  When she pointed out issues to Nahum about his deficiencies in data input he would deny he made the changes at issue.  However, LMI's E2 system had an audit trail that showed it was Nahum who made the changes.  On the same day, Green provided instructions to Nahum with specific steps to follow when a part was scrapped.  She had provided them previously but Nahum continued to fail to follow the necessary steps.  In addition, Nahum failed to complete some or all of tracking tasks that needed to be completed together for

8

both traceability and function at the site.  Nahum asserts, without any evidentiary support, that someone was deleting or changing his entries in the data system. Such transactions would have been recorded by audit trails.  Nahum has not produced any evidence to support his conclusory assertion.

On May 15, 2020, VanLeer reported to DeWalt that Nahum had brought her parts to scrap because Nahum was confusing the blueprints and thought the parts were made improperly (in the "opposite").  The parts were correct and merely needed to have the correct blueprints paired with them.  On the same day, Green learned that Nahum had scrapped parts even though the customer had not indicated that scrapping was necessary.

On May 20, 2020, VanLeer asked Nahum why he created a "shipper" on a particular job.  The issue was that Nahum, once again, made changes in the Quality Tracker even though he was not in possession of the job packet.  When another employee went into the system to update the job, it was closed.  Rather than correct this mistake, Nahum denied making the change.  However, the E2 system had an audit trail that showed Nahum made the changes and closed the job.

In addition to issues with his job duties, Nahum did not interact well with his co-workers.  Contracts Coordinator Lynch interacted with Nahum about his performance issues on a daily basis.  Nahum would often respond to her angrily.

For example, he hung up the phone on her in mid-conversation, stomped at her door when it was locked, and walked away from her in mid-conversation.  Nahum instructed co-workers to not return a part to him without providing him with a specific measurement of the thickness of a primer coat specification.  Green responded to Nahum that this specification was on the purchase order and other documentation related to the order that was readily available to Nahum.  Green concluded from this incident that either Nahum was unable to read specifications or that he lacked the initiative to do so.

Co-workers complained to DeWalt that Nahum was argumentative, unprofessional, rude, and impolite.  Green and Hagedorn confirmed these complaints.  Multiple employees who reported to VanLeer complained to her about Nahum's interactions with them, and his ongoing failure to properly perform his work assignments.  Given these concerns, VanLeer began discussing these issues with Nahum and experienced from Nahum dismissive responses and an unwillingness to accept feedback.  Nicole Freund, Customer Service Lead, also experienced dismissive behavior from Nahum several times when she attempted to speak with him about quality control issues.  In one instance, Freund asked Nahum if he possessed parts in his office that were urgently needed.  Nahum denied he had the parts.  Freund went to Nahum's office and quickly found the needed parts on a

shelf.  A Quality Inspector named Derek Jenkins reported to Human Resources that Nahum had put a part on top of Jenkin's food and told him "measure now."

Nahum had additional unprofessional issues in communications with LMI's customers.  On March 17, 2020, Anne Lancaster, a buyer for LMI's customer GKN Aerospace St. Louis, LLC, emailed Nahum about bad parts sent to GKN. Nahum responded that she should send the parts back to LMI for evaluation. Lancaster responded that GKN was trying to use the parts and asked whether Nahum had reviewed the same parts in stock at LMI to determine if LMI had parts without the same issue that could be used to replace the parts at GKN.  Nahum responded, "If the parts are acceptable per GKN specifications then you use it.  If the parts are not acceptable, please send the defectives back for an investigation/review."  Lancaster responded that she needed more than "oh just return them response" and reiterated her questions about whether LMI had the parts in stock.  Nahum responded, "Please let me be clear. Multiple parts have been reviewed as part of the first reported issue … Now I have instructed you to send back the parts if GKN find [sic] the part [sic] unacceptable … You have all you need."  Lancaster forwarded the email chain to another LMI employee and said "Setondji Nahum's response is unacceptable to just say return them."  Nahum responded, "I stand by my feedback.  Multiple parts have been reviewed and the extent of your criteria is unknown.  The mismatch you mention extends across a

range that I am unwilling to share with you because you are external to LMI.  As I previously specified, feel free to send back the parts."  As a result of Nahum's ongoing failure to respond to the customer's questions, other LMI employees were required to get involved to solve the problem because GKN faced a possible shutdown of their production line.  DeWalt instructed Lager and VanLeer to smooth the issue over quickly, and to talk with Nahum about how this issue could impact LMI.  As discussions regarding this issue continued internally, Nahum continued to refuse to cooperate.  Instead, he said, "They have enough materials to decide whether they will take the parts or not.  I don't have to share that root cause with the customer or send more parts with very minor length mismatch …"  Green found Nahum's interaction with GKN Aerospace to be completely inappropriate.

On April 22, 2020, Amy McClure from LMI customer Spirit AeroSystems sent Nahum an email addressing a number of issues.  She wrote, "I usually just fix your errors but there is beginning to be too many and for traceability I can't just keep fixing them … I need you to follow the instructions that were sent."  Nahum denied he had received the instructions.  On May 21, 2020, in another interaction, McClure emailed Nahum, "I can't submit the SSN. Part number listed on SSN is not the final part you deliver to Spirit.  Please correct SSN with Correct Part number.  And put in 'is Field Detail part number and the is Condition.' I have sent instructions for the 3rd time …"  Nahum responded, "Rest assured you do not need

to send those tag instructions.  Errors may be made at time [sic]. That is the reality of manufacturing and quality." DeWalt found that response unacceptable.  On May 11, 2020, DeWalt had a meeting with Nahum about how he was being perceived by co-workers and customers, and to discuss other performance issues. At the meeting DeWalt felt that Nahum was not open or receptive to feedback.

On May 22, 2020, DeWalt and Hagedorn met with Nahum to terminate his employment.  Green supported Nahum's termination because of issues with his technical performance and his relationships with co-workers and customers.  Lager supported Nahum's termination because he did not have the technical ability required for the position which he claimed to have during the interview process. Lager stated that someone with Nahum's represented skills and training should have been able to perform the corrective actions as necessary, but Nahum's performance did not show that he had the requisite skills.  Hagedorn supported Nahum's dismissal because of multiple performance based issues including Nahum's: inability to learn LMI process and procedures; refusal to follow directions from LMI subject matter experts; incidents of rude behaviors with co-workers; unprofessionalism such as walking away during conversations; and inappropriate emails to customers that were rude and often condescending. DeWalt decided to terminate Nahum's employment because of performance issues, including, lack of knowledge applicable to the job.  Specifically, DeWalt

determined that Nahum lacked the ability to read blueprints, interpret specifications, and the ability to use that information to determine whether or not a part could be moved forward with rework or scrap, which was the entire purpose of Nahum's position.

During his employment Nahum never complained about alleged race discrimination or retaliation.   On July 29, 2020, Nahum filed a charge with the U.S. Equal Employment Opportunity Commission ("EEOC").   In the EEOC charge, he alleged that he was terminated based on race and that the terms and conditions of his employment differed from those of similar employees.  He also checked the retaliation box on the EEOC charge.  In the written statement section of the EEOC charge he asserted that he suspects that LMI and Nahum's former employer, The Boeing Company, were conspiring and retaliating against Nahum for an employment discrimination lawsuit he filed against Boeing.[4]  The EEOC issued a Notice of Right to Sue on September 8, 2020.

On October 22, 2020, Nahum filed his original Complaint.  On January 19, 2021, Nahum filed an Amended Complaint alleging that his employment at LMI was terminated because of his race and that the terms and conditions of his employment differed from other similarly situated employees of different races.

---

[4] That case appears to be Nahum v. Boeing Company, 2020 WL 7695691 (W.D. Wash. Dec. 28, 2020) (granting Boeing's motion for summary judgment, case pending appeal before the Ninth Circuit).

He brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

2000e et seq. and the Civil Rights Act of 1866, 42 U.S.C. § 1981.  Although

Nahum checked the retaliation box on his EEOC charge, he does not assert a

retaliation claim in his Amended Complaint.  LMI has moved for summary

judgment which Nahum opposes.

### *Discussion*

### *Nahum's Title VII claim*

In his complaint Nahum alleges that he was terminated because of his race

and that the terms and conditions of his employment differed from other similarly

situated employees of different races.  Because Nahum has not produced any direct

evidence of racial discrimination, his claims are analyzed under the McDonnell

Douglas Corp. framework.  To establish a prima facie case of race discrimination

under Title VII Nahum must establish: (1) membership in a protected group; (2) he

was qualified to perform his job; (3) he suffered an adverse employment action;

and (4) circumstances were sufficient to permit an inference of discrimination.

Walker v. First Care Mgmt. Grp., LLC, 27 F.4th 600, 604–05 (8th Cir. 2022).

An adverse employment action is defined as "a tangible change in working

conditions that produces a material employment disadvantage, including but not

limited to, termination, cuts in pay or benefits, and changes that affect an

employee's future career prospects." Jackman v. Fifth Judicial Dist. Dep't. of Corr. Servs., 728 F.3d 800, 804 (8th Cir. 2013). "[M]inor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." Id.; Box v. Principi, 442 F.3d 692, 696 (8th Cir. 2006) (A "materially adverse action must be more disruptive than a mere inconvenience or an alteration of job responsibilities.") (cleaned up).

The undisputed evidence establishes that Nahum was not qualified to perform the job functions of a quality engineer or a manufacturing engineer at LMI. The skills needed in both positions overlap. The roles require the ability to read blueprints, interpret specifications, and the ability to use that information to determine whether or not a part could be moved forward with rework or scrap. Ample undisputed evidence supports LMI's management's opinion that Nahum lacked these essential skills. As a result, Nahum has failed to establish a prima facie claim on this ground.

Moreover, Nahum's claim that his interim placement in the Quality Department was an adverse employment action is without merit. It is undisputed that his pay, benefits, and hours of work were the same as if he had begun in the role of a manufacturing engineer. It is also undisputed that LMI frequently assigned employees of all races to interim positions to meet production demands.

16

Nahum asserts that the terms and conditions of his employment differed from other similarly situated employees of different races.  In support of that claim he argues that a Manufacturing Engineer named Brain Coleman, a Caucasian male, is a comparator who could have been assigned to the interim Quality role instead of Nahum.  He asserts that because he was assigned to the interim position instead of Coleman it establishes that the assignment was based on race.  Overlooking the fact that the interim Quality position was not an adverse employment action, Nahum cannot compare himself to Colman.  A plaintiff may show disparate treatment by the employer by identifying a similarly situated employee of a non-protected class who was treated more favorably than the plaintiff.  Gibson v. Am. Greetings Corp., 670 F.3d 844, 854 (8th Cir. 2012) (citation omitted).  To be "similarly situated," the employees "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."  Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000); Walker, 27 F.4th at 605. (The "test for whether someone is similarly situated is rigorous, and the plaintiffs must establish comparators outside their protected group were similarly situated in all relevant respects.") (cleaned up).

Nahum has alleged that he was the only employee who had to perform the quality control tasks that he was assigned.  Nahum does not specify how many

other Manufacturing Engineers were employed at LMI, how long they had been
working there, or the type of work that they were assigned.

Coleman has worked at LMI for 20 years as a Manufacturing Engineer.
Given his years of experience and expertise, Coleman remained in LMI's
Manufacturing Department while Nahum filled the interim Quality role.  Nahum
asserts that he has 7 years of experience in the aerospace and technology industry
with approximately 5 years of experience handling typical manufacturing
engineering tasks.  Coleman is not a comparator to Nahum.  Furthermore, Coleman
did not have any of the performance issues that Nahum exhibited which resulted in
his termination.

Even assuming that Nahum established a prima facie case based on his
termination, LMI has articulated a legitimate, non-discriminatory reason for the
termination of Nahum's employment.  LMI has produced undisputed evidence that
Nahum acted unprofessionally toward management, his co-workers, and
customers.  Nahum's dismissal was not only based on his inability to perform his
job duties, it was based on his interpersonal skill deficiencies.  Nahum has not
produced any evidence to create a material issue of fact to establish that LMI's
reasons for his dismissal were unfounded or that they were a pretext for race
discrimination.  Nahum has failed to produce evidence that would permit a jury to

find that he was subjected to race discrimination at LMI.  As a result, I will grant

LMI's motion for summary judgment as to Nahum's Title VII claim.

*Nahum's Section 1981 claim*

"The purpose of § 1981 is to prohibit discrimination in the 'performance,

modification, and termination of contracts' and to protect 'the enjoyment of all

benefits, privileges, terms and conditions of the contractual relationship.' "

Williams v. Lindenwood Univ., 288 F.3d 349, 355 (8th Cir. 2002) (quoting 42

U.S.C. § 1981(b)).  To establish a prima facie case of discrimination under § 1981,

the plaintiff must show (1) that he belongs to a protected class, (2) that the

defendant intended to discriminate on the basis of race, and (3) that the

discrimination interfered with an activity protected by the statute.  Harris v. Hays,

452 F.3d 714, 718 (8th Cir. 2006).  The causation element of a claim under § 1981

is more rigorous than under Title VII.  Under Title VII a plaintiff need only

establish that his protected status was a motivating factor in the employer's adverse

employment decision. Walker, 27 F.4th at 604–05.  In a § 1981 claim a plaintiff

must establish that his protected status was the but-for factor in the

employer'adverse employment decision.  Comcast Corp. v. Nat'l Ass'n of Afr.

Am.-Owned Media, 140 S. Ct. 1009, 1019 (2020).  Other than the causation

element difference, race discrimination claims under Title VII and § 1981 are

subject to the same analysis.  Takele v. Mayo Clinic, 576 F.3d 834, 838 (8th Cir.

19

2009) ("We apply the same analysis to claims of discrimination and retaliation under Title VII and 42 U.S.C. § 1981.")

Because Nahum has failed to establish his race discrimination claims under Title VII, he has also failed to establish such a claim under the higher causation standard of a §1981 claim. As a result, I will grant LMI's motion for summary judgment on Nahum's § 1981 claim.

*Nahum's retaliation claim*

To establish an employment retaliation claim under Title VII or § 1981 a plaintiff must show: (1) he was involved in a protected activity; (2) he was subjected to a subsequent adverse employment action, and (3) there was a causal relationship between the two. Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013) (Title VII – protected activity must be but-for cause of employer adverse action); Williams v. United Parcel Serv., Inc., 963 F.3d 803, 807 (8th Cir. 2020) (§ 1981 - a causal relationship exists where the desire to retaliate was the but-for cause of the adverse action.) (cleaned up).

Nahum does not assert a retaliation claim in his Amended Complaint. However, in an abundance of caution LMI addressed this claim because it was asserted in Nahum's EEOC charge. In his EEOC charge Nahum asserted that LMI and The Boeing Company were conspiring to retaliate against Nahum because he filed an employment discrimination lawsuit against Boeing. Nahum did not assert

this issue in his Amended Complaint, nor has he produced any evidence in support of this claim.  As a result, I will grant LMI summary judgment to any retaliation claim that could be gleamed from Nahum's Amended Complaint.

Accordingly,

**IT IS HEREBY ORDERED that** Defendant LMI Aerospace, Inc.'s motion for summary judgment [119], is **GRANTED**.


_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE


Dated this 1st day of May, 2023.